There are two issues, I believe, in the court, in the appeal before you this morning. One has to do with whether Mr. Dossman gets any relief because of an earlier panel's decision in the United States v. Hollis. I think the nub of the issue for this morning might be whether or not it's harmless. The other issue has to do with, I believe, focuses on whether I was entitled to either discovery or the right to issue a subpoena for information to utilize in connection with a Franks v. Delaware challenge to a search warrant. The case was a conditional plea preserving the first of those issues. Hollis was decided three days after sentencing, and then a substitute judge, because of an illness to the otherwise assigned judge, held a hearing under Rule 35 to determine whether it was clear error and denied that, denied relief under that. I had felt I had no choice but to try to do that within the time constraints of Rule 35 because of the timing of sentencing. It was on Friday. I believe Hollis came down on Monday. On the merits, Hollis clearly applies. The case is pending. And I believe it's clearly harmless, even though I think the government concedes it was plain error. They claim there was no substantial rights affected by the error. Let's just get on the same page here. Sure. Okay. On this issue, is your argument that we do not review for plain error? No. No objection was made. Well, that's correct. There was no basis for the objection until Hollis came down. Right. So Hollis comes down. I filed a motion either the same day or the next day, and within the time constraints of Rule 35, a memo was submitted to District Court Judge Burrell, who held a hearing on the claim that Hollis required resentencing on the grounds it was plain error to sentence him in excess of what Hollis would call for, and he denied the motion. So are we reviewing the denial of your Rule 35 motion? No. You're reviewing the failure you're reviewing a sentence that proceeded on the assumption that enhanced penalties applied when Hollis says, under the circumstance of this case, that they do not apply. It looks like we applied plain error review, and you get there's error, it was plain. And the question is whether it affected your substantial rights. And to sentence somebody to 240 months, which is the mandatory minimum, as it went through court in a case which, if I'm right, the sentence was zero to 30 years, because cocaine-based does not trigger the enhanced penalties under the mandatory minimum, under the statute, then under Velasco Heredia, decided by an earlier panel of this Court, it is clearly plain error, because he was exposed to a sentence that exceeded 30 years. But what Hollis itself did was to look at, and if it's appropriate or not, it's what it did, was to look at the actual evidence and to say, well, yes, they didn't charge it, and yes, it wasn't proven, but everybody knew this is what it was, that it was actually crack cocaine, and there's no doubt that's what it was. Well, that's what Hollis did. That's what Hollis did. But you're not bound by Hollis on the approach to harmless error, because Hollis miscited the authorities it relied on. It doesn't matter. We're still bound by it. Well, they didn't have the authority to overrule an earlier panel either. And harmless error in the sentencing context depends, varies depending on whether the indictment charged the fact as at issue or whether it did not. In Hollis, it did not. In this case, it did not. But in Smith and in Velasco Heredia, the indictments did charge the fact. They charged those two cases did concentrate on quantity. The quantity was charged, but not submitted to the jury in the one case, and not decided beyond a reasonable doubt by a judge who took a plea in the other case. Let me ask you a question. Sure. It seems when you read the sentencing proceedings in the PSR and whatnot, that he acknowledged he had, he dealt in crack. No, sir. Well, hold on. What's not wrong is that there was ever any admission as to the quantity. Which would make it a stronger case under Velasco Heredia in It's the same result, it seems to me. Right. Isn't that correct? I mean, there's never any. When he makes his statements to the probation officer or whatever, to the police or to the whatever. He came out of police reports. He made no statement. Yeah. Well, whatever. He made some statement about crack. But there's never any admission on his part in any of those statements as to the amount of crack. That's true. I mean, he made a statement to officers. Now, one of his buddies, the other guy. Gibson. Yes, sir. Mr. Gibson, he makes reference to a couple of ounces of crack or something. But it's not all linked. At least on this record, it's not linked. Between the two of them? No. They also proceeded on separate tracks and separate times. Right. And that, in part, was because there was no, the negotiations faltered. But that wasn't the basis for your Rule 35 motion. The basis for Rule 35 was that the allegation of cocaine base because of Hollis did not trigger the mandatory minimum. Let me ask you something. Did the new cocaine, crack cocaine guidelines and retroactivity have anything to do with this or not because this is all about mandatory minimums and not about crack? This is also not about the changes in crack because he was sentenced under the career offender guideline. I see. Which it's not driven by quantity. It's driven by the maximum sentence. And that has, there's a drastic effect between whether Hollis applies here or not. It makes a difference between whether it's. But it's also dealing with a statutory mandatory minimum, isn't it? Well, true. If I'm right, there is no mandatory minimum. I understand that. But that's another reason why the guidelines change doesn't matter here. True. No, that is true. He was sentenced, Mr. Dussman was sentenced to the statutory mandatory minimum as it was understood to apply to cocaine base at the time we went through proceedings. Hollis tells us we were wrong. All right. How about the other issue? Hold on. Hold on. For the mandatory minimum to kick in. Right. What's the quantity of crack that would have to be demonstrated in this record? 50 grams. 50 grams for a 10 to life, which would have made a 20 to life, which was assumed to apply after the government. And how would that have affected the guideline range? The guideline range, well, you mean the difference between powder and crack? Yes. The guideline range was 188 to 235. The top of the guidelines was less than 20 years. However, no, I'm sorry, the career offender guideline, which would have applied anyway, was 188 to 235 on a 0 to 30 case rather than 262 to 327, which was. But any problem with the amount wasn't affected by Hollis and could have been raised before. Well, the only influence amount had was whether it triggered a mandatory minimum in the first place, because whether there's a mandatory minimum does affect how you go into the career offender guideline, because it's driven by the statutory maximum. So this would have gone in at a 34 rather than 37. It made a three-level swing. Now, let's go to the merits of the case and the discovery question. Right. I have two things I want to know about that. One is that the ultimate decision by the judge turned on an in-camera determination. And we don't have the information that he saw in camera, right? It was according to the transcript of the hearing. It was submitted to the judge either that morning or the day before. It was considered by him, but was never made part of the record. And we don't have it, so we can't review it. And all he said was there's no – there was no search, which isn't really the answer to the relevant question, because the relevant question is did this guy have drugs? They could have not had a search, but he could have had the drugs. And they could have known it. Right. They could have taken it thinking there was no search. They could have gotten a statement. He could have told them that they had it. He could have seen it. He could have been informed and just said here it is. And the request for that, I think, was broad enough to ask for the information in whatever form it came up. That is more clear from the pleadings, incidentally, than from the hearing. So then what gives me pause next is, yes, but, I mean, they say that you didn't give enough information anyway to trigger a Frank's discovery request, essentially. And it is fairly striking that presumably if your client did hand anything over, he would know it. So he didn't say, I didn't hand anything over. And that makes it somewhat disturbing in terms of why there is enough to get to a Frank's discovery. I mean, he could have just said, you know, I didn't, the reason I want this information is because I don't remember giving that guy anything. So I want to know what you found. Are you asking me what's in the record or what he may have said to me in private? No, I'm asking you whether you made enough of a showing to have Frank's discovery. Without that. I believe he did. I mean, the assertions I made about what happens, why a car stop is made after a transaction that is vaguely described, I know just from experience the same way any experienced criminal lawyer knows that a narcotics officer who saw an exchange of what looked like cash for what looked like drugs would often say so in order to persuade a magistrate that that's what he saw. Here they didn't do that. They call it a hand-to-hand transaction, which could have been anything. And I know because I found out in a narcotics officer's surveillance note, not in another police report, that they asked that that stop be done. And I know when a narcotics officer asks someone to stop, they want to know who's in the car and they want to know something about the transaction they just saw. And when none of that goes to the magistrate, even as Judge Levy found out, my inference that that might favor me was reasonable. Now, as to, I mean, that's the contents of the showing. That's as specific as was made in Nixon for one of the tapes, a rational inference that what they wanted to hear in the tapes would be found solely because of the names of the participants of the conversations. In McKee, which is cited in the government's brief, in a price-fixing case after indictment, the government asked for appointment books and desk calendars. And this panel, this court said, well, the government hasn't seen it. We can't ask for anything more specific without that, but they've shown enough to get it. So that's why I think that the inferences I drew from the circumstances of the stop and the fact that it was omitted from the warrant is enough to let me see it. Now, there are some hints, you know, beyond the no-search thing, there's discussion about whether what the government really didn't want to disclose was whether they got a statement from a person that they would want to protect the identity of rather than give up the statement. But as is clear from the hearing, as Judge Alito said, they didn't do that. Well, what bothers me, you know, I gather there is some precedent for doing this in camera, but I don't understand how it's reviewable when we don't have the information to review it. Well, I don't know how you review it either. Well, did you ask the district court judge to place whatever he saw, whatever he was reviewing, under seal and file? No, I wasn't privy to the fact that he had gotten it until he said so in the middle of the hearing. Of course, neither did the government ask him to. You could have asked him at that point. I could have, and if I could. He said, I object, Your Honor, I didn't, you know, whatever. Or, you know, for purposes of appeal, I need to have you, I need to have the court take those documents, place them under seal and file them. Right. But an objection is an in-camera examination is an intermediate step in responding to requests for information. So he says, yeah, I could have asked him to keep it, make it part of the record. And I didn't, but neither did the government, and the court didn't take it upon itself. The bottom line is it's not part of the record. And that much is not reviewable. The only thing known about it is that he said there's no search. I beg your pardon. That hand-to-hand thing was, for this reason or any other, not properly in the declaration. Was there still enough basis for probable cause? I'm sorry, Your Honor. I missed the first part. If the hand-to-hand allegation was taken out of the warrant application, how does that affect the Frank's determination or that part of the claim? Well, that's the least ambiguous piece of conduct they pointed to. Beyond that, they had a stale tip that had never, either had never been even explored or had been dismissed out of hand. They had an old ---- Well, could they have had probable cause to search that house even if they didn't have probable cause to suspect your client? No. Because Gibson kept going to that house and was there when he made a phone call in the middle of one of the ---- just before one of the transactions and was using the car from the house and was, you know, seemed to be involved with that house. I don't think a single visit ---- well, the visits to the ---- Gibson made one visit to the house, and that's the one you refer to where he made a phone call, but that occurred in November. That's three or four months before the warrant is issued. The other ---- How many months? I didn't hear you. How many months? One month. Three? No. It's November to February. Okay. Three months. Okay. So ---- and it was a single instance. He was also stopped at an Aquino Drive address, which he had a pattern of stopping at on his way to making transactions. So I don't think a single visit would support probable cause, even if you take Mr. Gossman out of the picture and ask and analyze it. Is there probable cause to believe there would be evidence found there in February solely because of Gibson's activities? So on the basis of one visit, I would say no. If it's otherwise taken out, if the least ambiguous conduct is taken out, then I think there's a valid claim that there's no probable cause or an intermediary claim that a full evidentiary hearing to figure out more about what was said, seen, or done or what the witness might say is a Franks hearing. Under any of those scenarios, a remand, you know, for a determination in light of the additional evidence or consideration whether it makes a difference would be in order. Can I save the balance of your time, please? Yes, please. May it please the Court. My name is Matthew Siegel. I represent the United States in this case. Your Honors, what happened in this case, the things that are challenged are not error. They are exactly how the system should work. Sacramento police officers conducted a three-and-a-half-month-long investigation that involved confidential source purchases from one target. And when they successfully were able to buy from that target, they didn't just snap them up for a small case. They followed them around to other locations to look at other persons associated with him and ended up seizing large quantities of what's alleged in the indictment as cocaine vase and is clear from the facts is raw cocaine or crack. When they accumulated all that evidence after their three-and-a-half-month-long investigation, they went to a neutral, detached magistrate. They showed all that evidence to him, and that magistrate said there's probable cause to search not only Gibson's house, but the residence, the undisclosed residence of Dossman, where Gibson has been, whose car Gibson is driving, where Gibson is when he calls to confirm the quantity that the confidential source is buying from Gibson. That magistrate authorizes a search warrant and authorizes night service, which I'll get into if the court has questions about that. Then the case is adopted in federal court for federal prosecution, and there's a question about whether certain documents are disclosable to the defense. And, you know, the first thing that happens is, you know, broad liberal discovery was provided in this case, but it wasn't going to be open file because it was an informant case. And when a dispute came up about a particular transaction where the defendant was asking for information about exactly with whom he had, we think, done a hand-to-hand transaction, we answered no. But just to make sure, and really not for the Rule 16. No, meaning no, we're not going to give you the information. That's right, Your Honor. And no, there was no search. And to make sure that it's not Brady, we disclosed it to the district court. And that's the first finding, that's where the district court's hearing begins, is that it wasn't Brady. And in the last footnote in the district court's order denying this discovery, he drops a footnote to make clear, I've looked at this, it's not helpful to defense, it's not Brady. Now, there is precedent for that, as Your Honor, Judge Berzon remarked. I don't want to make it so this Court can't review it. I actually have the documents here, and I can leave them with the Court's clerk if that's what the Court would prefer. I think when the Court looks at them, it would be very clear that they don't show there was a search, they're not exculpatory, they are internal police documents which is conceded by the defendant and covered by Fort. Which was decided since the district court ruled in this case. Why don't you just – how come they weren't just filed with the district court under seal? I'm just curious. You know, because there are cases – well, one, it was unobjected to. I think if it had been requested that it be filed under seal with the district court, I wouldn't have had a problem with that. At the time, my understanding, and still my understanding of how to proceed when you have material and you want to make – the prosecutor wants to make sure that it's not Brady, give it to the district court judge, see what the district court judge thinks of it, and put it in the correspondence file. But too informal. Excuse me, Your Honor? It seems very informal. I think it's also very common. Okay. I mean, it's not then thrown away if the district court judge says, no, it's not Brady, it's in our correspondence file, there's a record maintained. It is a little disconcerting, though, for a court of appeals when something is turning on it. I mean, we do have an opinion of several pages discussing it, and we don't have it. So it makes it very difficult for us to evaluate. Well, I think – If it didn't matter, then it didn't have to be done. If it did have to be done, then we ought to have it. It didn't – it only – it doesn't matter because the defendant doesn't say it was Brady. Now, what the defendant has to show, since it's not Brady, is, is it disclosable under Rule 16 as material to the defense? And even that now doesn't matter under Fort if it's internal police documents. If it's what I'm saying. Internal police documents. And then, even if it were not internal police documents, has the defendant made a sufficient preliminary showing of materiality? Now, all the defendant says is this is – Dossman does a hand-to-hand transaction in a church's chicken parking lot with the occupants of a Mazda. The Mazda drives away, and the Mazda is stopped. District Court finds there was no search. The reason the defendant wants these materials is he reasons if there was a search and it came up negative, that would lead to the inference that this wasn't a narcotics transaction, it wasn't a sale from Dossman to the occupants of the vehicle. Well, as the District Court observed, and Your Honor observed, there are other possibilities as well. The transaction could have been going in the opposite direction, for one thing. The occupants of that Mazda could have been the suppliers to Dossman, and then the crack would have been with Dossman, not with them. But then, you know, unfrustrated by it, and the Saniago, the prison gang files case, says you can't get material to the defense, you know, Rule 16 discovery, merely positing that question. There has to be some substantial basis. And what the defendant did get in discovery in this case was the surveillance notes, including the names of the officers who conducted that stop. He could have gone to talk to them. There's no evidence that they even attempted to do that. There's no evidence that they attempted to make any material of showing immateriality or that they knew at all what happened in this stop. What about, to back up for a minute, whether even with the hand-to-hand thing in there, there's probable cause under this warrant. Okay. It seemed to me to be at least borderline, if not under borderline. And I'm curious to know why it's not. Okay. This is what's disclosed in the warrant. October 7th to 14th, the confidential source buys from Gibson, and Gibson goes to 2949 North Meadows, which I'll just now call 2949, after the sale. And that's in the excerpts of record at 95 to 97. Then you have at some point between October 28th and November 4th, 2004, Gibson gets an order from the confidential source, goes to 2949, enters   And then he goes to 2949. And then he goes to 2949. Calls the confidential source to confirm the order, leaves a minute later and delivers to the CS. And during this time, Dossman's Buick and his motorcycle are there in the parking lot of that building. And that's in, and actually this is sort of important. I have the wrong site to the search warrant. I used the search warrant pagination and not the excerpts of record pagination. That narrative occurs at 98 to 99 in the excerpts of record. Well, there's more after that. You're saying that Gibson was only at his house once. He was there twice. But both several, you're saying that he was not, Gibson was at his house more than once. He was at his house twice. But all several months before the actual search. There is other suspicious conduct that makes. No, I understand that. But just on that fact, when Gibson was at his house. Was that. I'm just making sure. I think that's right, Your Honor. And then on November 10th, it's established through surveillance at 2949 that Dossman. It wasn't his motorcycle. It wasn't registered to him. Well, it's a motorcycle that he's observed on with his helmet off. So they know it's him. And then they see him driving away on it. So he's got the keys. He's got the helmet. He cares for it enough to wipe it down. And it's registered to somebody with his surname at the address that Dossman, defendant Dossman, not Charlie E., if that is a real person, at 8443 Newby and Elk Grove. That's the address that defendant Dossman uses in his registration as a defendant. So I think it was Dossman's motorcycle. He certainly had use of it. And the complaint that the police should have investigated who this other Dossman was under this Courts on Bank decision in Gorda doesn't express a Frank's violation anyway. That's just a criticism of the investigation. So that's November 10th. They see Dossman there. And they see Dossman there at the same time that he maintains a record address in Elk Grove, completely apart from that, with, I guess, this registered owner of the motorcycle, which the police regard legitimately as suspicious. Then on December 2nd, Dossman does this counter-surveillance driving on his way to either 4005 or 3993 or perhaps another street address. And, you know, it's in the excerpts of record at 7576, but, you know, he goes north and west and east and then south or, you know, whatever the order is. But it's clearly not straight-line driving. Then he does the hand-to-hand at the churches on December 16th, 2004. And I think PC's getting pretty fresh here. And, by the way, staleness was not argued. The only thing that the defendant argues is stale is the defendant's criminal record. Staleness doesn't appear in the defendant's brief at all besides that. They chose not to argue this in district court. They chose not to argue it here. December 17th, Gibson uses Dossman's Buick to deliver to the confidential source. That's excerpts of record 100. January 13th, Dossman is doing such high-speed and aggressive counter-surveillance driving that actually he loses surveillance. That's at excerpts of record 81. And then January 24th, Dossman's Buick is at 2811 Aquino, which is pretty well-established as Gibson's other stash location. That's where his mother lives. That's at 81. And then January 26th, the magistrate signs the warrant. So I think there's ample probable cause. I think if the defendant had made the argument that Your Honor anticipates about staleness, it would still fail because there's suspicious conduct right up to two days before the warrant's signed. And the magistrate judge, you know, is entitled to all the deference that this court's law allows him. He thought there was probable cause. And then the district court thought there was probable cause. So it can't be that the detective then looks at that warrant and couldn't rely on it in good faith. I mean, that much is absolutely certain. I believe, as the district court did in this case, that there was probable cause by the appropriate standard of review. But it can't be that the state magistrate, federal district court judge, saw this, thought there was probable cause, but, you know, poor detective Patton should have realized that it was so lacking that he couldn't rely on it in good faith under Leon. I don't have a lot of time. So I'm going to turn to the sentencing issue in this case. Your Honor, Judge Pius, there is ample evidence of the quantity in this case. The quantity, I don't have the PSR in front of me, but quantity is always in the PSR. And the defendant did not object to the PSR when expressly asked during sentencing. The quantity is in the factual basis of the plea agreement at Excerpts of Record 51. It was based on cocaine base, correct? That's right. There are weights, but the word cocaine base is used. But from the entire context of this case and all the evidence, cocaine base is rock in this case. It's the only thing it is. What he confessed to was turning powder into rock. And he had the cooking implements. And, you know, when you read Hollis's explanation of the difference between, you know, generic cocaine base and crack or rock, it's pretty obvious that it's rock that you get from cooking cocaine. The only thing he had was rock. As far as I can tell. I mean, he wasn't chewing cocaine paste like, you know, they do in the Andes. I mean, this was he was getting cocaine, as far as we can tell, and he was cooking. And what you get when you cook, if you read Hollis, is crack. Right. And 266 grams. And there are other parts of the record that have weight as well. And what about the observation that Hollis, with regard to the way it treated the harmless error question, may not be consistent with earlier precedent? Well, it's clear error anyway in this case. I'm sorry? It's clear. The standard in this case is clear error because the defendant didn't object. Hollis. I understand that. But what it did was to, without regard, even though there was no mention of crack cocaine in the indictment, nor was there a specific finding at any point, just from the fact that it had been sort of assumed through the trial that it was crack cocaine. That's why Hollis said that was sufficient for harmless error purposes. Well, Hollis said there was, first, Hollis was a trial. And Hollis, there were two reasons why. There was witness testimony that it was crack, and then Hollis didn't object to the PSR findings that it was crack. Just like this case, except instead of witness testimony. What I'm asking is whether Hollis is consistent with earlier cases as to the way one finds harmless error, whether it's a printy error. I got Smith and Velasco Heredia handed to me this morning. So, you know, as best I can do, Hollis is distinguishable, and here's why. In Velasco Heredia, the amount actually was contested in the plea, and there was a whole special sentencing hearing where that was contested. That is not, and maybe harmless error should apply under those circumstances. That's not this case at all, because clear error applies in this case. And in Smith, you know, Smith holds that failure to object to drug quantity in a PSR means it is harmless error. You speak at the PSR, which I have right here. Paragraph, you're talking about Paragraph 7. It talks about 101.55 grams of cocaine base. 74.9 grams of cocaine base. It's also where he talks about cooking into rock in Paragraph 7. Detective sees numerous items of rock cocaine cooking, paraphernalia, and two electronic scales. So from that we are to infer that the 181.55 grams of cocaine base, and 84.49 grams of cocaine base, really was crack cocaine. And the defendant, the next passage in that is Dossman admitted under Miranda he cooked and sold rock cocaine, and that the gun, cooking equipment, rock cocaine, and cash at the residence belonged to him. So of these quantities, which were the ones that were found at his residence? Everything in Paragraph 7. Everything found in Paragraph 7 was found at his residence? There were 266 grams. It was in two separate locations, in jacket sleeves, and without having Paragraph 7 in front of me, yes, I believe that's right. Dossman did not get hit with relevant conduct for Gibson's crack in this case. He had about nine ounces. What's concerning about it is essentially when you have a verbal confusion like this, and it's running all the way through the documents, it's really not clear why we believe one, you know, why it is that we say, well, it must have been rock cocaine, instead of it must not have been rock cocaine, when in fact the terminology is being used interchangeably, and the conclusion of Hollis is it shouldn't have been. Well, I think Hollis says you're not supposed to use cocaine base in an indictment or in a jury instruction when you mean rock cocaine, but it also says that when that's been done and a reviewing court is examining the record, when it's clear, when all the evidence is clear that it's rock cocaine, then it's clear. Well, I wasn't sure that all of this was rock cocaine. That's the problem. But there's no evidence, none in the record, Your Honor, that says that there were two sorts of cocaine in this. In order to get, as I understand it, I have no idea, but to get the rock, you need the base. You need to start with something. What you need is the powder. Or the powder. So it could be that some of this was powder. There's no basis for that in the record, and we're in clear error because it was unobjected to. Well, we're on plain error. Excuse me. It's plain error. We're in plain error. We're in substantial rights. We're in plain error review. Was there error? Yes. Was it plain? Yes, because Hollis existed. Did it affect his substantial rights? In other words, with the sentence, is there enough here in this record? I mean, for example, if he had pled, if he had said, I admit I had 260 grams of rock cocaine, you know, then obviously that would take care of the problem, but that's not what happened here. Well, I'd like you to turn, Your Honor, to the defendant in this case submitted his own proposed Rule 11 colloquy. Where is that? That's the particular page is in the supplemental excerpts of record at page 74. What did he say? He said that he agreed that the amount of, that the right amount, well, I'll quote it directly. He says he agrees that the quantity seized was in excess of 50 grams, so as to trigger the penalty provisions of 21 U.S. Code section 841B1A. He said it was 50 grams of rock cocaine? Well, B1A is the 10-to-life provision that is only crack. I mean, he would, if it's 50 grams and it triggers B1A's penalty provisions, then it is crack. Give me that record site again. It's SER 74, and it's the last line. And that's where the defendant clearly states that he understands that this is crack, it's more than 50 grams, he's facing sentencing at that time, mandatory minimum of 10 years, once the prior is filed, 20 years. Okay. I've got, is the rules, I'm ready to address Rule 17, but I see that the light is red. Rule 17, back to the? Back to the discovery, because we were talking about Rule 16. Right. Rule 17 is a subpoena, right? Right. And there was no evidentiary hearing. He wants to issue a trial subpoena for an evidentiary hearing he never earned because he never made a substantial preliminary showing under Franks. And that's really it. I mean, I think. So you're basically saying you just can't use Rule 17 to get a Franks hearing. It has to be only after the Franks hearing has been set. The defendant cited no case that says the contrary. I'm aware of none. 17 is once an evidentiary hearing where a trial has been ordered. Then you can start issuing subpoenas. He gets it backwards by wanting to crank up the whole machinery of a Franks hearing in order to get a Franks hearing. And Judge Levy, in his order and reason, says it better than I could. Thank you, Your Honor. Thank you. Very briefly, folks. With respect to whether on the subpoena question, whether police documents are internal documents, as he was quoting Rule 16a2. That's not what he's saying. He's saying you can't get it anyway because there was no Franks hearing order. Well, that's not – I don't think that's true. The pleadings in support of the request said, I want to use this at a Franks hearing, not just for the preliminary showing. Kaiser, which I cited to you folks in a – I don't mean to be so informal. But he denies a Franks hearing. Then he denies – if that's the reason you want it, if you're not going to have a Franks hearing, then you don't get it. Well, I think the issue is whether – the issue goes off on whether or not a hearing has been set. Under the local rules, in general, I set the hearing date. I'm sorry? Under the local rules in the Eastern District, I set the hearing date. The judge can deprive me of it. In the Nixon or McKee situation, if – You set a hearing date for an evidentiary hearing as opposed to for a hearing on the question of whether to have an evidentiary hearing? Well, that – that is a way to set the briefing schedule. Now, typically, we either ask the judge – I mean, typically, we set a case for a hearing. Now, sometimes, you know, we've learned to ask particular judges whether that's non-evidentiary. I set a case for a hearing on a legal issue, but I never heard of setting a hearing on a factual issue unless somebody orders one. Well, I've also been chastised by a judge for not having witnesses at such a – what I thought was a non-evidentiary hearing. So that's up in the air. But at any rate, the preliminary showing is a preview of what you intend to show at a hearing. So the reason for asking for the material by subpoena, if subpoena is the way to go, is to get an advanced look at evidence that's going to be used at a hearing. Now, in the trial situation, if you get an advanced subpoena for a trial where a trial is set and it produces a – and it gives you grounds for a motion, it's certainly not the rule that you can't file the motion in reliance on what you've got, even though there's no hearing set when you get that information. But my point on the 16A2 thing was the judge did not go to whether these reports were work product or not. He said that hadn't been adequately briefed for him. Now, with respect to the rock cocaine, which was the term used in Mr. Siegel's argument, Hollis mentioned Shaw, which was the earlier case where the scope of cocaine had been discussed by this court. And they said that cocaine includes rock cocaine and any smokable – crack, rock cocaine, any non-salt smokable form of cocaine. Rock cocaine is a non-salt smokable form of crack cocaine. It is not a substitute for Hollis's requirement that you say crack instead of cocaine base, that you say something else instead of cocaine base. Rock does not equate with crack. Shaw, which is cited in Hollis, is the best case on that point. Thank you. Thank you, counsel. We appreciate your arguments. The matter will be submitted. Why don't you file them? Do you have any objection to file them under seal? I do, because the focus is narrower than the request. I mean, it's not that I don't want you to see it or I necessarily question the provenance, but to focus on whether or not there was a search was an unfair narrow – No, we understand that. We understand that. Why don't we – we'll – We may as well have it. We'll either look at it or not look at it, and we will either evaluate it or not evaluate it. But to go get it afterwards would be more difficult. Our next case for argument and the last case for today is United States v. Aguilar. Thank you.
judges: Hug, Paez, Berzon